## Norfolk

## WALTER C. HARRIS

v.

## COMMONWEALTH OF VIRGINIA

No. 1351-87-1

Decided July 18, 1989

COUNSEL

Michael F. Fasanaro, Jr., for appellant.

Eugene Murphy, Assistant Attorney General (Mary Sue Terry, Attorney General, on brief), for appellee.

OPINION

**BAKER, J.**—Walter C. Harris (appellant) appeals from a judgment of the Circuit Court of the City of Hampton (trial court) which affirmed his jury convictions for capital murder and use of a firearm in the commission of a felony. He asserts that the trial court erred in denying his motion for a bill of particulars after the Commonwealth was permitted to amend the indictment; erred in admitting hearsay evidence related by four of the Commonwealth's witnesses; and erred in refusing to set aside the jury verdict and grant a new trial.

In 1983 and 1984, the Federal Bureau of Investigation (F.B.I.) was investigating Howard Wornom (victim) for mail fraud. As part of a plea bargain agreement which he made with federal authorities, victim agreed to testify against Earl Powell and to assist in recording conversations between himself and Powell. As a consequence of the investigation, Powell was arrested on September 12, 1984 and subsequently indicted for ten counts of mail fraud,

obstruction of justice and perjury. Powell's arrest warrant indicated that victim was a material witness.

On October 18, 1984, victim was shot and killed in front of his residence in Hampton. From inside their home his wife heard shots and responded to his call that he had been shot. Outside she went to victim and asked him whether "he had seen who had shot him," and he replied, "Yes, I saw them." She then asked, "were they black or white?" and victim said, "it was the black." Two officers arrived, followed by an ambulance and several police cars. Three or four minutes later, at 8:50 p.m., victim told Karen O'Keefe, a cardiac technician, "that a black man had shot him." Prior to the ambulance's arrival, victim told Officer Meadows when asked, "what happened?" that a "black man came out and shot him." Victim died at 3:40 a.m. the following morning.

Approximately ten days before the killing appellant had asked George Engle how to contact some white men whom he wanted to do a "hit" on victim. Six to eight weeks after the killing, appellant told Engle, "Cross Earl Powell and he'll get you."

Gaston McNeill, appearing on behalf of the Commonwealth, testified that he also was charged in connection with the murder, that he had not been offered anything in exchange for his testimony, that no promises had been made, and that no one told him it would go any easier on him if he testified.

Before the killing, appellant and McNeill rode to Hampton on several occasions looking for victim. Appellant told McNeill that he had to stop victim from going to court because he was a "snitcher" and that he was going to "snuff" him out. Thereafter, McNeill attempted to avoid appellant; however, he did meet with him again. On at least one occasion Calvin Tucker told McNeill that if he, McNeill, in appellant's presence, opened his mouth he would be killed. McNeill testified that Tucker repeated this threat on occasions when appellant was not present. The same day, McNeill, Tucker and appellant rode to an apartment complex in search of victim. While the others waited, Tucker looked around the area but was unable to locate victim.

On the night of the killing a black man of the same size as Tucker was seen hiding in the bushes near the site of the killing. That same night Tucker was seen walking away from the area of

the killing between 8:45 and 9:00 p.m. While Tucker and appellant were both incarcerated, Eddie Frye, at the direction of Tucker, wrote appellant a letter requesting $600. In the letter Tucker told appellant that "they brought me down here to testify against you. The Commonwealth told my lawyer if I testify against you on my appeal he won't bring no evidence against me. I am not going to do you like you did me. I think six hundred dollars will be enough to get the things I need when I'm locked up."

On August 26, 1987, prior to appellant's trial, the Commonwealth was permitted to amend the original capital murder indictment charging appellant as a principal in the second degree. The indictment was amended over appellant's objection by adding the words "or as an accessory before the fact." Throughout the preliminary hearing stage and presentation to the grand jury, appellant had been charged only as a principal in the second degree. As a result of the amendment, defense counsel moved for a bill of particulars, which was denied.

Within minutes after the jury returned its verdict and appellant was formally sentenced, McNeill was brought to court to plead to a simple misdemeanor, his capital murder charge having been reduced, and was sentenced to twelve months in jail. Based on a claim that McNeill had given false testimony at the trial, defense counsel moved for a new trial immediately thereafter; however, when the Commonwealth Attorney represented to the court that no promise had been made to McNeill, appellant's motion for a new trial was denied.

Appellant first asserts that the trial court erred in failing to grant his motion for a bill of particulars and by permitting the Commonwealth to amend the indictment over his objection.

The indictment returned by the grand jury charged that appellant did, as a principal in the second degree, deliberately, and with premeditation kill Howard Wornom during a killing for hire, in violation of Code §§ 18.2-18 and 18.2-31(8). Prior to the trial, the Commonwealth requested and received the trial court's permission to amend the indictment by adding the words "or an accessory before the fact" between "second degree," and "unlawfully." Appellant immediately moved for a bill of particulars. His motion was denied.

■ Whether a motion for a bill of particulars should be granted is a matter committed to the exercise of the sound discretion of the trial court. *Ward v. Commonwealth*, 205 Va. 564, 569, 138 S.E.2d 293, 297 (1964). The indictment sufficiently informed appellant of the charge upon which he was to be tried, and he was neither deprived of any substantial right nor subject to the danger of being tried on a charge for which he had not been indicted. *Id.*; *see also Tasker v. Commonwealth*, 202 Va. 1019, 1023-24, 121 S.E.2d 459, 462 (1961). Moreover, under the indictment he could be convicted either as a principal in the first or second degree or as an accessory before the fact. *See* Code § 18.2-18; *Hyman v. Commonwealth*, 206 Va. 891, 147 S.E.2d 156 (1966). Because appellant has not shown that the trial court abused its discretion it was not error to deny his motion for a bill of particulars.

Appellant next alleges that the trial court erred by permitting Gaston McNeill to testify to statements made by Calvin Tucker.

There is evidence in the record to support a finding that Calvin Tucker and appellant conspired to kill victim because he intended to testify on behalf of the United States in a prosecution of Earl Powell. Gaston McNeill was a party to some of the early conversations between Tucker and appellant, and he had been with them on at least one occasion when they tried to find victim; however, if McNeill had been a party to the conspiracy there is evidence in the record from which it could be inferred that he withdrew prior to the consummation of its purpose. There is ample evidence in the record to show that Tucker and appellant continued the conspiracy until victim was shot to death on October 18, 1984.

■ At trial, McNeill testified that Tucker twice threatened to kill him if he revealed his knowledge of the action planned by Tucker and appellant. Appellant does not object to McNeill's recitation of a threat that took place in the presence of appellant; however, he asserts that it was reversible error to permit him to repeat the threats made out of appellant's presence. We disagree. The statement was admissible as one made by a co-conspirator in furtherance of the conspiracy. *See Anderson v. Commonwealth*, 215 Va. 21, 24, 205 S.E.2d 393, 395 (1974); *Amato v. Commonwealth*, 3 Va. App. 544, 552, 352 S.E.2d 4, 9 (1987). In any event, since appellant made no objection to McNeill's recitation of the first threat, admission of the second threat was harmless beyond a reasonable doubt.

Appellant further alleges that the trial court erred in permitting the Commonwealth to introduce into evidence, through the testimony of Mrs. Wornom, Karen O'Keefe, and Officer Meadows, statements made by victim on separate occasions.

At approximately 8:40 p.m. on October 18, 1984, victim was shot in the head at close range. The evidence discloses that three shots were fired at the victim; two missed, but were so close that they left powder on his face and shoulder. The third furrowed across his scalp tearing his skull and injuring a blood vessel underneath his skull and over his brain. His brain was also damaged. The shot was the cause of victim's death, which occurred in a hospital at 3:40 a.m. the following day.

Mrs. Wornom's testimony, to which appellant objected, concerned victim's responses to her inquiries made immediately after she heard him call out, "I've been shot," and when she first viewed the blood running down his face. She asked victim whether he had seen his assailant and if he were black or white. She was permitted to testify that he answered, "Yes," to the first inquiry and, "black," to the second.

Appellant further objected to the testimony of Karen O'Keefe, a cardiac technician who arrived on the scene approximately seven minutes after the shooting. She testified that when she arrived victim was holding a bloody towel to his head, where she observed a bullet hole, that she placed him on a gurney and was moving him to the ambulance when he grabbed her shirt, pulled her down to him and said, "the black man shot me," after which he lost consciousness and was transported to a hospital.

Officer Meadows was in a police car close enough to the scene of the shooting to hear the shots which were fired at victim. In response to a radio dispatch aired at 8:45 p.m. he drove to the scene, arriving at 8:46 p.m. Appellant objected to Meadows' testimony that he immediately approached victim and inquired, "Where's the gun?" The victim first gave an answer which disclosed confusion, but then said, "No, it's not here, I've been shot." Meadows then asked, "What happened?" and was told that a black man came out, shot victim and left that way, pointing across the street.

██ All of the statements were made within ten minutes of the shooting and while victim was bleeding from a gunshot wound which had damaged his brain and from which he died several hours later.

> [E]xcited utterances prompted by a startling event, and not the product of premeditation, reflection, or design, are admissible in evidence. The spontaneity of the utterance is deemed to guarantee its trustworthiness, even though it is hearsay evidence which would otherwise be excluded. The declaration must be made at such time and under such circumstances as to preclude the presumption that it is the result of deliberation.

*Nicholaou v. Harrington*, 217 Va. 618, 622, 231 S.E.2d 318, 321-22 (1977); *see also Doe v. Thomas*, 227 Va. 466, 471, 318 S.E.2d 382, 386 (1984). While the test "is whether the statement is the transaction speaking through the declarant or the declarant speaking about the transaction," there is "no fixed rule by which the question whether the statement is admissible as an excited utterance can be decided." *Clark v. Commonwealth*, 235 Va. 287, 292, 367 S.E.2d 483, 486 (1988).

> Resolution of the issue depends on the circumstances of each case and "rests within the sound judicial discretion and judgment of the trial court." That discretion and judgment, of course, is subject to review. Nonetheless, in a doubtful case there "is a presumption in favor of the action" of the trial court.

*Id.* (citation omitted); *see also Huffman v. Commonwealth*, 168 Va. 668, 681, 190 S.E. 265, 271 (1937). Considering all the circumstances disclosed by this record we find no abuse of discretion in the trial court's decision, and hold that the trial court properly admitted the hearsay declarations made by victim.

Finally, appellant alleges that the trial court erred in denying appellant's motion for a new trial. Gaston McNeill was an important witness for the prosecution. He also had been indicted for the capital murder of victim. At appellant's trial McNeill swore that he was voluntarily testifying against appellant without a plea agreement or promise of any kind. He added that he expected to

be tried.

In less than an hour after the jury returned its verdict fixing appellant's sentence at life imprisonment, and only minutes after the trial court had entered judgment on that verdict, McNeill was brought before the trial court where the capital murder charge against him was reduced to a misdemeanor, to which he pled guilty and received a sentence of twelve months in jail.

Upon discovery of this swift disposition of McNeill's case appellant moved the trial court to set aside the verdict and order a new trial, asserting that those facts suggest "that Mr. McNeill's testimony concerning his understanding or his anticipation or his hopes in the disposition of his case was clearly false."

In response to appellant's statement the Commonwealth Attorney stated "that at no time prior to the conclusion of the *guilt phase* of the W. C. Harris case had either myself or any member of my staff or any law enforcement officer concerned with this case spoken with Gaston McNeill about the disposition of his case, or [with] his attorney, Mr. Rogers." The transcript discloses that Mr. Rogers was in court at appellant's trial when McNeill was testifying. The jury returned its guilty verdict at approximately 7:27 p.m. and began to consider an appropriate punishment at 8:06 p.m. Its sentence verdict was returned at 8:29 p.m. An inference from the Commonwealth Attorney's statement relative to discussion of the agreed disposition of McNeill's case is that it took place during the twenty-three minutes taken by the jury to fix appellant's punishment. It is not inconceivable that such an agreement could have been made during that time. The trial court overruled appellant's motion. Its judgment was one of fact which we find is supported by credible evidence and we are bound thereby. *See* Code § 8.01-680.

Accordingly, the judgment of the trial court is affirmed.

*Affirmed.*

Barrow, J., and Cole, J., concurred.